**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| FLEET CONNECT SOLUTIONS LLC,<br><br>Plaintiff,<br><br>v.<br><br>RIVIAN AUTOMOTIVE, INC.,<br><br>Defendant. | Civil Action No.: 6:23-cv-00623<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Fleet Connect Solutions LLC ("Fleet Connect") files this complaint against Rivian

Automotive, Inc. ("Rivian" or "Defendant") alleging, based on its own knowledge as to itself and

its own actions, and based on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a patent infringement action to stop Defendant's infringement of the following

United States Patents (collectively, the "Asserted Patents"), copies of which are attached hereto as

**Exhibit A**, **Exhibit B**, **Exhibit C**, **Exhibit D**, **Exhibit E**, **Exhibit F**, **Exhibit G**, and **Exhibit H**

respectively:

| | U.S. Patent No. | Title |
|---|---|---|
| A. | 7,450,955 | System And Method For Tracking Vehicle Maintenance Information |
| B. | 7,206,837 | Intelligent trip status notification |
| C. | 6,549,583 | Optimum Phase Error Metric for OFDM Pilot Tone Tracking in Wireless LAN |
| D. | 6,633,616 | OFDM Pilot Tone Tracking for Wireless LAN |
| E. | 7,058,040 | Channel Interference Reduction |
| F. | 8,494,581 | System and methods for management of mobile field assets via wireless handheld devices |
| G. | 7,260,153 | Multi Input Multi Output Wireless Communication Method and Apparatus Providing Extended Range and Extended Rate Across Imperfectly Estimated Channels |
| H. | 7,656,845 | Channel Interference Reduction |
| I. | 7,742,388 | Packet Generation Systems and Methods |
| J. | 8,005,053 | Channel Interference Reduction |

2.      Plaintiff seeks injunctive relief and monetary damages.

## PARTIES

3.      Plaintiff is a limited liability company formed under the laws of Texas with its registered office address located in Austin, Texas.

4.      On information and belief, Defendant is a corporation organized under the laws of the State of Delaware with its principal place of business located at 14600 Myford Road, Irvine, California 92606.

5.      Defendant may be served through its registered agent for service in Delaware, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

6.      Fleet Connect repeats and re-alleges the allegations in Paragraphs above as though fully set forth in their entirety.

7.      This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

8.      Venue is proper against Defendant in this District pursuant to 28 U.S.C. § 1400(b) because it maintains an established and regular place of business in this District and has committed acts of patent infringement in this District.  *See In re: Cray Inc.*, 871 F.3d 1355, 1362- 1363 (Fed. Cir. 2017).   Defendant has an office at 622 Morrow St, Austin, Texas 78752 where it sells, offers for sale, uses, services, and delivers the Accused Products.

9.      Defendant is subject to this Court's specific and general personal jurisdiction under due process and/or the Texas Long Arm Statute due at least to Defendant's substantial business in

this judicial district, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this district.

10.     Specifically, Defendant intends to do and do business in, have committed acts of infringement in, and continue to commit acts of infringement in this District directly, and offers their services, including those accused of infringement here, to customers and potential customers located in Texas, including in the Western District of Texas.

11.     Defendant commits acts of infringement from this District, including, but not limited to, use of the Accused Products and inducement of third parties to use the Accused Products.

## THE ASSERTED PATENTS AND ACCUSED PRODUCTS

12.     Fleet Connect repeats and re-alleges the allegations in Paragraphs above as though fully set forth in their entirety.

13.     Defendant uses, causes to be used, provides, supplies, or distributes one or more computing devices, including, but not limited to, the R1T, R1S, RCV, and EDV (and any and all predecessor and successor models, names, or releases) with Fleet OS, the Rivian Vehicle Care System, Driver+, Rivian Cloud and/or Rivian's mobile apps (collectively, the "Accused Products").



Rivian FleetOS
Advanced fleet management.

- Our proprietary management platform, designed to optimize and automate fleet operations to help improve your total cost of ownership and maximize uptime
- Comprehensive trip oversight, remote diagnostics and collision reports designed to improve driver safety
- Easy purchasing, leasing and resale that will simplify ownership
- Integration with non-Rivian products to manage mixed-vehicle fleets
- Cloud-based tools conveniently accessible on multiple devices

Source: https://rivian.com/fleet



Source: https://apps.apple.com/us/app/rivian/id1570215232

# What features are included in Rivian Driver+?

Driver+ features are standard on every Rivian vehicle. Some may be introduced through over-the-air software updates following start of production, including Lane Change Assist and Trailer Assist. Driver+ is designed to support drivers and does not replace their attention, judgment, and need to control the vehicle.

**Driving Assist: Help with the manual driving tasks when you want it.**

- Highway Assist: Automatic steering, braking and acceleration on select highways while engaged.
- Adaptive Cruise Control: Set your speed and automatically accelerate or brake, adjusting speed to keep an appropriate distance from vehicles in front of you.
- Lane Change Assist: Assisted lane changes on the highway.

**Active Safety Assist: Collision warning, alerts and preventative action.**

**Lane Safety**

- Lane Keep Assist: Helps steer you back into your lane if you unintentionally drift close to or over a lane marker without a turn signal.
- Lane Departure Warning: Warns you if you drift too close or cross lane markers without a turn signal on.
- Blind Spot Warning: Detects vehicles in your blind spots and warns you if you indicate with your turn signal that you are going to move into the occupied lane.

**Light Safety**

- Automatic High Beams: Automatically switches the headlights from high to low beams when a vehicle is detected ahead.

**Parking and reverse**

- Rear Cross-Traffic Warning: Alerts you to traffic and people approaching from the side when backing up.
- Park Assist: A 360° detection system designed to help sense and alert you to objects.
- Trailer Assist: Helps with reverse maneuvers while you have a trailer attached.

**Collision Mitigation**

- Forward Collision Warning: Warns you of potential collisions with people and cars ahead.
- Automatic Emergency Braking: Applies the brakes to help mitigate or prevent a collision.
- Dynamic Brake Support: Supports your braking to help mitigate or prevent a collision.

Learn more about Driver+ in the R1T and the R1S.

Source: https://rivian.com/support/article/what-features-are-included-in-rivian-driver

Rivian Remote Care enables us to perform comprehensive diagnostics from afar through our connected vehicle platform. Most issues can be identified proactively thanks to our suite of onboard sensors and associated predictive algorithms. We can often notify you before you even sense a problem.

Source: https://stories.rivian.com/rivian-service

What is FleetOS?                                                          —

Rivian FleetOS is our clean sheet, fully integrated fleet management platform. It features everything you need to manage your vehicles with easy-to-use tools and powerful dashboards that offer insights about the health, performance, service, charging and utilization of fleets at any scale.

Our fleet management platform enables fleet managers to operate a safe, cost-effective fleet with ease.

Source: https://rivian.com/support/article/what-is-fleetos



Source: https://play.google.com/store/apps/datasafety?id=com.rivian.android.consumer&hl=en_US&gl=US





Source: https://rivian.com/fleet

### 1 Identify

We'll either proactively notify you of an issue or you can contact us directly through your app by calling our Rivian Service Team 24/7, or your Rivian Guide. Next, we'll set the optimal repair plan.

Source: https://stories.rivian.com/rivian-service

What is FleetOS?                                                    —

Rivian FleetOS is our clean sheet, fully integrated fleet management platform. It features everything you need to manage your vehicles with easy-to-use tools and powerful dashboards that offer insights about the health, performance, service, charging and utilization of fleets at any scale.

Our fleet management platform enables fleet managers to operate a safe, cost-effective fleet with ease.

Source: https://rivian.com/support/article/what-is-fleetos

### Rivian Ecosystem
#### Simplifying electrification at scale.

Our integrated ecosystem starts with Rivian FleetOS, our proprietary platform designed to help fleets achieve maximum efficiency, safety and functionality. FleetOS unifies full fleet telematics, charging, maintenance, purchasing and resale into a single platform. Our energy and charging solutions are built specifically for commercial customers' needs. All of our products are backed by our 24/7 support team including Rivian Mobile Service and our nationwide network of Rivian Service Centers. By integrating the entire fleet experience, Rivian is able to reduce the total cost of fleet ownership to levels unmatched in the industry.

Source: https://rivian.com/fleet



Source: https://rivian.com/fleet

14.    The Accused Products perform wireless communications and methods associated with performing and/or implementing wireless communications including, but not limited to, wireless communications and methods pursuant to various protocols and implementations, including, but not limited to, Bluetooth, IEEE 802.11, and LTE protocols and various subsections thereof, including, but not limited to, 802.11ac, 802.11b, and 802.11n.

15.    The wireless communications perform and/or implemented by the Accused Products, among other things, transmit data over various media, compute time slot channels, generate packets for network transmissions, perform or cause to be performed error estimation in orthogonal frequency division multiplexed ("OFDM") receivers, and various methods of processing OFDM symbols.

16.    Defendant was notified that the Accused Products infringe the Asserted Patents in April of 2023.

17.    For these reasons and the additional reasons detailed below, the Accused Products practice at least one claim of each of the Asserted Patents.

**COUNT I: <u>INFRINGEMENT OF UNITED STATES PATENT NO. 7,450,955</u>**

18.    Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

19.    U.S. Patent No. 7,450,955 (the "'955 patent") was issued on November 11, 2008 after full and fair examination by the USPTO of Application No. 11/524,858 which was filed on September 20, 2006.  A true and correct copy of the '955 patent is attached as **Ex. A**.  A Certificate of Correction was issued on September 24, 2013.  *See id.* at p. A-19.  A second Certificate of Correction was issued on May 1, 2018.  *See id.* at p. A-20.

20.     The claims of the '955 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting methods and systems for tracking vehicle maintenance information.

21.     The written description of the '955 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

22.     Fleet Connect owns all substantial rights, interest, and title in and to the '955 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

23.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '955 patent.

24.     Based upon public information, Fleet Connect is informed and believes that Defendant has infringed one or more claims of the '955 Patent because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises the Accused Products.

25.     Upon information and belief, the Accused Products meet each and every step of at least Claim 1 of the '955 Patent, either literally or equivalently.

26.     For example, Defendant performs a method for tracking vehicle maintenance information by a system administrator.   The method includes identifying by the system administrator a vehicle associated with a vehicle identifier of a receiving mobile unit; determining

a warning associated with the vehicle; generating baseband message data indicating the warning by constructing at least one data packet from a plurality of data fields, the data fields including a unique identifier of a transmitting mobile unit, and the vehicle identifier of the receiving mobile unit; upconverting the baseband message data to radio frequency for transmission to the receiving mobile unit; transmitting the upconverted baseband message data from the transmitting mobile unit to the receiving mobile unit, thereby indicating the warning; and receiving a confirmation of receipt from the receiving mobile unit including parsing the confirmation of receipt to confirm the warning was received.

27.     Since at least the time of receiving the Fleet Connect Letter in August of 2020, Defendant has also indirectly infringed one or more claims of the '955 patent by inducing others to directly infringe said claims.  Defendant has induced end-users, including, but not limited to, its employees, partners, or contractors, to directly infringe, either literally or under the doctrine of equivalents, the '955 patent by providing or requiring use of the Accused Products.  Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '955 patent, including, for example, claim 1.  Such steps by Defendant included, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.  Defendant performed these steps, which constitute induced infringement with the knowledge of the '955 patent and with the knowledge that the induced acts constitute infringement. Defendant was aware that the normal and customary use of the Accused Products by others would infringe the '955 patent.  Defendant's inducement is ongoing.

28.     Defendant has also indirectly infringed by contributing to the infringement of the '955 patent.  Defendant has contributed to the direct infringement of the '955 patent by their personnel, contractors, and customers.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '955 patent, including, for example, claim 1.  The special features constitute a material part of the invention of one or more of the claims of the '955 patent and are not staple articles of commerce suitable for substantial non-infringing use.

29.     Defendant has had knowledge of the '955 Patent since at least the time it received the Fleet Connect Letter in August of 2020.

30.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Fleet Connect's patent rights.

31.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

32.     Defendant's direct infringement of the '955 patent was willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

33.     Defendant's aforesaid activities have been without authority and/or license from Fleet Connect.

34.     Fleet Connect is entitled to recover from Defendant the damages sustained by Plaintiff as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II:   INFRINGEMENT OF UNITED STATES PATENT NO. 7,206,837**

35.      Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

36.      U.S. Patent No. 7,206,837 (the "'837 patent") was issued on April 17, 2007 after full and fair examination by the USPTO of Application No. 10/287,151 which was filed on November 4, 2002.  A true and correct copy of the '837 patent is attached as **Ex. B**.

37.      The claims of the '837 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.   Rather, the claimed inventions include inventive components that improve upon the function and operation of voice and data communications systems.

38.      The written description of the '837 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

39.      Fleet Connect owns all substantial rights, interest, and title in and to the '837 patent, including the sole and exclusive right to prosecute this action and enforce the '837 patent against infringers and to collect damages for all relevant times.

40.      Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '837 patent.

41.      Based upon public information, Fleet Connect is informed and believes that Defendant has infringed one or more claims of the '837 Patent because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises the Accused Products.

42. Upon information and belief, the Accused Products meet each and every step of at least Claim 1 of the '837 Patent, either literally or equivalently.

43. For example, Defendant provides a method comprising receiving a location of a mobile communications device that is in transit to a destination, estimating the time-of-arrival bounds for said mobile communications device at said destination for a confidence interval based on said location and at least one historical travel time statistic, and sending the time-of-arrival bounds to said mobile communications device.

44. Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed one or more claims of the '837 patent by inducing others to directly infringe said claims. Defendant has induced end-users, including, but not limited to, its employees, partners, or contractors, to directly infringe, either literally or under the doctrine of equivalents, the '837 patent by providing or requiring use of the Accused Products. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '837 patent, including, for example, claim 1. Such steps by Defendant included, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner. Defendant performed these steps, which constitute induced infringement with the knowledge of the '837 patent and with the knowledge that the induced acts constitute infringement. Defendant was aware that the normal and customary use of the Accused Products by others would infringe the '837 patent. Defendant's inducement is ongoing.

45.     Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed by contributing to the infringement of the '837 patent.  Defendant has contributed to the direct infringement of the '837 patent by their personnel, contractors, and customers.   The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '837 patent, including, for example, claim 1.  The special features constitute a material part of the invention of one or more of the claims of the '837 patent and are not staple articles of commerce suitable for substantial non-infringing use.

46.     Defendant has had knowledge of the '837 patent since at least the time of receiving a notice letter from Fleet Connect in April of 2023.

47.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Fleet Connect's patent rights.

48.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

49.     Defendant's direct infringement of the '837 patent was willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

50.     Defendant's aforesaid activities have been without authority and/or license from Fleet Connect.

51.     Fleet Connect is entitled to recover from Defendant the damages sustained by Plaintiff as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

52.     Fleet Connect has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Fleet Connect has and will continue to suffer this harm by virtue of Defendant's infringement of the '837 patent.  Defendant's actions have interfered with and will interfere with Fleet Connect's ability to license technology.  The balance of hardships favors Fleet Connect's ability to commercialize its own ideas and technology.  The public interest in allowing Fleet Connect to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT III:   INFRINGEMENT OF UNITED STATES PATENT NO. 6,549,583**

53.     Fleet Connect repeats and re-alleges the allegations in Paragraphs above as though fully set forth in their entirety.

54.     The United States Patent and Trademark Office duly issued the '583 patent on April 15, 2003, after full and fair examination of Application No. 09/790,429 which was filed February 21, 2001.  A true and correct copy of the '583 patent is attached as **Ex. C**.

55.     The claims of the '583 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting error estimation methods.

56.     The written description of the '583 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

57.     Fleet Connect owns all substantial rights, interest, and title in and to the '583 patent, including the sole and exclusive right to prosecute this action and enforce the '583 patent against infringers and to collect damages for all relevant times.

58.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '583 patent.

59.     Defendant has directly infringed one or more claims of the '583 patent by manufacturing, providing, supplying, using, distributing, selling, or offering to sell the Accused Products.

60.     Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claim 1 of the '583 patent.   For example, Defendant, using the Accused Products, performs a method of pilot phase error estimation in an orthogonal frequency division multiplexed (OFDM) receiver.   The method includes determining pilot reference points corresponding to a plurality of pilots of an OFDM preamble waveform; and estimating an aggregate phase error of a subsequent OFDM data symbol relative to the pilot reference points using complex signal measurements corresponding to each of the plurality of pilots of the subsequent OFDM data symbol and the pilot reference points; wherein the estimating step comprises performing a maximum likelihood-based estimation using the complex signal measurements corresponding to each of the plurality of pilots of the subsequent OFDM data symbol and the pilot reference points.

61.     More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products to perform wireless communication according to techniques for modern OFDM-based receivers when utilizing one or both of the IEEE 802.11ac protocol and the ETSI 3GPP TS 136.101, *et. seq.* protocol.   IEEE 802.11ac is a very high

throughput (VHT) orthogonal frequency division multiplexing (OFDM) system.  IEEE 802.11ac performs pilot phase error estimation.  Similarly, the 3GPP's Long Term Evolution ("LTE") standards (*e.g.,* ETSI 3GPP TS 136.101, et. seq.) comprise a very high throughput (VHT) orthogonal frequency division multiplexing (OFDM) system.  Defendant perform wireless communication according to the 802.11ac and/or LTE protocol when using the Accused Products. 802.11ac determines pilot reference points corresponding to a plurality of pilots of a VHLTF field which is in the preamble of an OFDM waveform, and LTE uses CSI reference signals (CSI-RS) of an OFDM waveform.  The 802.11ac receiver equalizer of the Accused Products estimates the aggregate phase error across all streams and the LTE receiver equalizer of the Accused Products estimates the aggregate phase error across all streams.



Source*:* **Exhibit K**, at page K-5.

62.     Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Fleet Connect in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT IV:   INFRINGEMENT OF UNITED STATES PATENT NO. 6,633,616**

63.     Fleet Connect repeats and re-alleges the allegations in Paragraphs above as though fully set forth in their entirety.

64.     Fleet Connect owns all substantial rights, interest, and title in and to the '616 patent, including the sole and exclusive right to prosecute this action and enforce the '616 patent against infringers and to collect damages for all relevant times.

65.     The United States Patent and Trademark Office duly issued the '616 patent on October 14, 2003, after full and fair examination of Application No. 09/935,081 which was filed August 21, 2001.  A true and correct copy of the '616 patent is attached as **Ex. D**.

66.     The claims of the '616 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting error estimation methods.

67.     The written description of the '616 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

68.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '616 patent.

69.     Defendant has directly infringed one or more claims of the '616 patent by manufacturing, providing, supplying, using, distributing, selling, or offering to sell the Accused Products.

70.     Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claim 12 of the '616 patent.  For example, Defendant, using the Accused Products, performs a method of pilot phase error estimation in an orthogonal frequency division multiplexed (OFDM) receiver.  The method includes determining pilot reference points corresponding to a plurality of pilots of an OFDM preamble waveform; processing, in a parallel path to the determining step, the OFDM preamble waveform with a fast Fourier transform; determining a phase error estimate of a subsequent OFDM symbol relative to the pilot reference points; and processing, in the parallel path to the determining step, the subsequent OFDM symbol with the fast Fourier transform; wherein the determining the phase error estimate step is completed prior to the completion of the processing the subsequent OFDM symbol with the fast Fourier transform in the parallel path.

71.     More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products to perform wireless communication according to techniques for modern OFDM-based receivers when utilizing one or both of the IEEE 802.11ac protocol and the ETSI 3GPP TS 136.101, *et. seq.* protocol.  IEEE 802.11ac is a very high throughput (VHT) orthogonal frequency division multiplexing (OFDM) system.  IEEE 802.11ac performs pilot phase error estimation.  Similarly, the 3GPP's Long Term Evolution ("LTE") standards (*e.g.,* ETSI 3GPP TS 136.101, et. seq.) comprise a very high throughput (VHT) orthogonal frequency division multiplexing (OFDM) system.  Defendant performs wireless communication according to the 802.11ac and/or LTE protocol when using the Accused Products. 802.11ac determines pilot reference points corresponding to a plurality of pilots of a VHLTF field which is in the preamble of an OFDM waveform, and LTE uses CSI reference signals (CSI-RS) of an OFDM waveform.  The 802.11ac receiver equalizer of the Accused Products estimates the aggregate phase error across all streams and the LTE receiver equalizer of the Accused Products

estimates the aggregate phase error across all streams.   In parallel with determining pilot reference points, the OFDM preamble waveform is processed.   The 802.11ac receiver architecture processes OFDM preambles with FFT in parallel with determining pilot reference points (*e.g.,* for MIMO channel estimation). The pilot reference points are identical on all streams, thereby allowing the receiver to estimate phase error on the channel for the subsequent OFDM symbols.   The LTE receiver equalizer estimates the aggregate phase error across all streams.   The phase error estimation is completed prior to completion of the processing subsequent OFDM symbol with FFT, because the phase error estimation is used to correct errors in the transmission.   The 802.11ac architecture performs MIMO channel estimation (phase error estimation) prior to completion of the OFDM symbol processing.   The LTE architecture uses FFT prior to the completion of the processing the subsequent OFDM symbol.



Source*: **Ex. K**, at page K-5*

72.    Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Fleet Connect in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V:   <u>INFRINGEMENT OF UNITED STATES PATENT NO. 7,058,040</u>

73.     Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

74.     The United States Patent and Trademark Office duly issued the '040 patent on June 6, 2006, after full and fair examination of Application No. 09/962,718 which was filed September 21, 2001.  A true and correct copy of the '040 patent is attached as **Ex. E**.

75.     The claims of the '040 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting data transmission methods.

76.     The written description of the '040 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

77.     Fleet Connect owns all substantial rights, interest, and title in and to the '040 patent, including the sole and exclusive right to prosecute this action and enforce the '040 patent against infringers and to collect damages for all relevant times.

78.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '040 patent.

79.     Defendant has directly infringed and continue to directly infringe the '040 patent by manufacturing, providing, supplying, using, distributing, selling, or offering to sell the Accused Products.

80.     Defendant has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '040 patent.  For example, Defendant, using the Accused Products, performs a method for data transmission over first and second media that overlap in frequency.  The method includes computing one or more time division multiple access (TDMA) time-slot channels to be shared between the first and second media for data transmission; allocating one or more time-slot channels to the first medium for data transmission; allocating one or more of the remaining time-slot channels to the second medium for data transmission; and dynamically adjusting a number of timeslot channels assigned to one of the first and second media during the data transmission to remain within limits of a desired level of service.

81.     More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products to perform a method for data transmission over first and second media that overlap in frequency because the Accused Products communicate according to either the 3GPP TS 136.101, *et. seq.* LTE protocol or the 802.11b and Bluetooth protocols which involve transmission over first and second media that overlap in frequency when using the Accused Products.  The Accused Products also communicate according to LTE (*e.g.,* 3GPP LTE) using different media, including a first and second media, which overlap in frequency when using the Accused Products.  3GPP TS 36.211 sets forth a resource grid structure for allocating transmission resources to 4G LTE systems.  According to this two-dimensional time and frequency grid structure, frequency channels are shared between different transceivers in time domain, by using time division (TDM) slot channels.  A unit time slot spanning a group of subcarriers (*e.g.*, 12 adjacent subcarriers equivalent to 180KHz frequency) is referred to as a Resource Block (RB) or Physical Resource Block (PRB).  A resource block (a time and frequency unit) is the smallest bandwidth or unit of transmission resource that can be allocated to a user equipment (UE) or

transceiver.  Further, each radio time frame (10ms in case of LTE) is divided into multiple sub-frames (1ms each) and each such sub-frame includes two time slots.  3GPP LTE follows OFDMA based multiplexing in resource allocation.  Each media or UE/transceiver is allocated one or more (a group of) RBs/PRBs for data communication in uplink and/or downlink, *i.e.*, each transceiver is allocated a fixed set of subcarriers over a period of time.  A first transceiver communicates using its allocated frequency subcarriers (first medium), while a second transceiver uses its allocated subcarriers to communicate (second medium).  A first and second media that are allocated RBs along the same time frame or sub-frame overlap in frequency.  As just one example, the method includes (a) computing one or more time division multiple access (TDMA) time-slot channels to be shared between the first and second media for data transmission, *e.g.,* 802.15.2-2003 sets forth the mechanism for Alternating Wireless Medium Access (AWMA) to reduce interference between 802.11 and 802.15 signals.  In AWMA, the beacon period of an 802.11b frame is shared between first media (WLAN) and second media (WPAN) for data transmission; (b) allocating one or more time-slot channels to the first medium for data transmission, *e.g.,* the Accused Products allocate a time-slot channel (WLAN interval to the first medium (802.11b) for data transmission); (c) allocating one or more of the remaining time-slot channels to the second medium for data transmission, *e.g.,* the Accused Products allocate a time-slot channel (WPAN interval) to the second medium (802.15) for data transmission; and (d) dynamically adjusting a number of time-slot channels assigned to one of the first and second media during the data transmission to remain within limits of a desired level of service, *e.g.,* the 802.11b beacon frame includes a Medium Sharing Element (MSE) which defines the length of the time-slot channels (WLAN, WPAN, and Guard).  The Offset, Length and Guard intervals can be dynamically adjusted to modify the number

of time-slot channels assigned to WLAN and WPAN data transmission to remain within limits of a desired level of service.



Source: **Ex. K**, at page K-5

82.     Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has indirectly infringed and continues to indirectly infringe the '040 patent by inducing others to directly infringe the '040 patent.   Defendant has induced and continue to induce customers and end-users, including, but not limited to, Defendant's customers, employees, partners, or contractors, to directly infringe, either literally or under the doctrine of equivalents, the '040 patent by providing or requiring use of the Accused Products.   Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '040 patent, including, for example, claim 1.   Such steps by Defendant has included, among other things, advising or directing customers, personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.   Defendant has been performing these steps, which constitute induced infringement with the knowledge of the '040 patent and with the knowledge that the induced acts

constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products by others would infringe the '040 patent.  Defendant's inducement is ongoing.

83.     Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of the '040 patent.  Defendant has contributed and continue to contribute to the direct infringement of the '040 patent by its customers, personnel, and contractors.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '040 patent, including, for example, claim 1.  The special features constitute a material part of the invention of one or more of the claims of the '040 patent and are not staple articles of commerce suitable for substantial non-infringing use.  Defendant's contributory infringement is ongoing.

84.     Defendant had knowledge of the '040 patent since at least the time of receiving a notice letter from Fleet Connect in April of 2023.

85.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Fleet Connect's patent rights.

86.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

87.     Defendant's infringement of the '040 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

88.     Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Fleet Connect in an amount that compensates it for

such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

89.     Fleet Connect has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Fleet Connect has and will continue to suffer this harm by virtue of Defendant's infringement of the '040 patent.  Defendant's actions have interfered with and will interfere with Fleet Connect's ability to license technology.  The balance of hardships favors Fleet Connect's ability to commercialize its own ideas and technology. The public interest in allowing Fleet Connect to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

### COUNT VI:   INFRINGEMENT OF UNITED STATES PATENT NO. 8,494,581

90.     Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

91.     The USPTO duly issued the '581 patent on July 23, 2013.  A true and correct copy of the '581 patent is attached as **Ex. F**.  An *Inter Partes* Review Certificate was issued on July 23, 2019 in which claims 1-17 were cancelled.  An *Ex Parte* Reexamination Certificate was issued on October 29, 2019 in which affirmed the cancellation of claims 1-17 and cancelled claims 18-20 and 24.

92.     The claims of the '581 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting methods and systems of collecting and communicating field data based on geographical location.

93.     The written description of the '581 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how

the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

94.     Fleet Connect owns all substantial rights, interest, and title in and to the '581 patent, including the sole and exclusive right to prosecute this action and enforce the '581 patent against infringers and to collect damages for all relevant times.

95.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '581 patent.

96.     Based upon public information, Fleet Connect is informed and believes that Defendant has infringed one or more claims of the '581 Patent because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises the Accused Products.

97.     Upon information and belief, the Accused Products meet each and every step of at least Claim 21 of the '581 Patent, either literally or equivalently.  For example, Defendant uses the Accused Products to perform a method that using a handheld device to access an assessment program stored in a memory of a computing device located geographically remote from the handheld device, the assessment program being configured to enable a field assessment in a specific industry; collecting field data associated with the field assessment using the handheld device in response to the assessment program; using the handheld device to determine a geographical location of the handheld device; and communicating the field data collected using the handheld device and the geographical location of the handheld device to the computing device.

98.     Defendant's aforesaid activities have been without authority and/or license from Fleet Connect.

99.     Fleet Connect is entitled to recover from Defendant the damages sustained by Plaintiff as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT VII: INFRINGEMENT OF UNITED STATES PATENT NO. 7,260,153

100.     Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

101.     The United States Patent and Trademark Office ("USPTO") duly issued the '153 patent on August 21, 2007, after full and fair examination of Application No. 10/423,447, which was filed on April 28, 2003.  A true and correct copy of the '153 patent is attached as **Ex. G**.

102.     The claims of the '153 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the function and operation of voice and data communications systems.

103.     The written description of the '153 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

104.     Fleet Connect owns all substantial rights, interest, and title in and to the '153 patent, including the sole and exclusive right to prosecute this action and enforce the '153 patent against infringers and to collect damages for all relevant times.

105.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '153 patent.

106.     Defendant has directly infringed the '153 patent by importing, selling, manufacturing, offering to sell, using, providing, supplying, or distributing the Accused Products.

107.     Defendant has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '153 patent.  For example, Defendant, using the Accused Products, performs a method for evaluating a channel of a multiple-input multiple-output ("MIMO") wireless communication system allowing two or more communication devices with multiple radiating elements to transmit parallel data sub-streams which defines a channel matrix metric of cross-talk signal-to-noise ("SNR") for the subs-streams, estimates the channel matrix metric, performs a singular value decomposition ("SVD") of the channel matrix metric estimate to calculate estimated channel singular values, and using the channel matrix metric and estimated channel singular values to calculate a crosstalk measure for the sub-streams.

108.     More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products, which are adapted by Defendant for wireless communications using multiple communication protocols, including LTE and/or 802.11n. 802.11n implements beamforming in a MIMO system. LTE supports single and multi-user MIMO transmissions.  A MIMO communication system comprises at least two communication devices (*e.g.*, STA A, STA B, BS and/or UE) having a plurality of radiating elements (antennas) for the parallel transmission of data sub-streams.   802.11n implements beamforming that defines a channel matrix metric (Hk) that comprises a predefined function (equation 20-62) of channel matrix singular values for each of the data sub-streams.  MIMO systems utilized within the context

of LTE transmission can define a channel matrix metric that comprises a predefined function of channel matrix singular values for each of the data sub-streams. Each of the predefined functions provides a measure of cross-talk signal to noise ratio (SNR) for sub-streams.  To implement implicit beamforming, the beamformer obtains an estimated channel matrix.  As part of the LTE standards, reporting of channel information further consists of a channel quality indicator (CQI). To estimate channel singular values, a singular value decomposition (SVD) is performed of the baseband-to-baseband channel matrix metric. The SVD comprises a left-hand unitary weighting matrix, *e.g.,* $B_{RX,k}$, a diagonal matrix of said estimated channel singular values, and a right-hand unitary weighting matrix $A_{TX,k}$. Various algorithms can be implemented within an LTE MIMO system, including a singular value decomposition (SVD) comprising a left-hand unitary weighting matrix, a diagonal matrix of said estimated channel singular values, and a right-hand unitary weighting matrix.  A crosstalk measure (*e.g.*, $K_{A,k}$) is calculated for each sub-stream k (*e.g.,* sub-band) from the channel matrix metric (*e.g.*, $H_{AB,k}$) and the estimated channel singular values.

| Integrated Module Info: | ❖ WLAN (Wi-Fi 2.4, 5 GHz) , Bluetooth  BDR/EDR: |
| | • FCC ID : XPYJODYW167 |
| | • Name / Number : UBLOX / JODY-W1 |
| | ▪ Wi-Fi 2.4 and 5 GHz : 802.11 a/b/g/n/h/ac |
| | ▪ Bluetooth BDR/EDR : Disabled. See Note 1 |
| | ❖ Cellular Module: |
| | • Name / Number : ALAS5-AM |
| | • FCC ID : QIPALAS5-AM |
| | ❖ GPS/GNSS: |
| | • UBLOX NEO - M8L - 04A Standalone GNSS receiver |
| | • GEMALTO AIAS5 – GNSS receiver module integrated with the cellular modem. |

Source*:* **Ex. K**, at page K-5

109.    Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed and continues to indirectly infringe the '153 patent by inducing others to directly infringe the '153 patent.  Defendant has induced distributors and end-

users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '153 patent by providing or requiring use of the Accused Products.  Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '153 patent, including, for example, claim 1 of the '153 patent.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.  Defendant is performing these steps, which constitute induced infringement with the knowledge of the '153 patent and with the knowledge that the induced acts constitute infringement.  Defendant is aware that the normal and customary use of the Accused Products by others would infringe the '153 patent.  Defendant's inducement is ongoing.

110.    Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of the '153 patent.  Defendant has contributed to the direct infringement of the '153 patent by its personnel, contractors, distributors, and customers.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '153 patent, including, for example, claim 1 of the '153 patent.  The special features constitute a material part of the invention of one or more of the claims of the '153 patent and are not staple articles of commerce suitable for substantial non-infringing use.  Defendant's contributory infringement is ongoing.

111.    Defendant had knowledge of the '153 patent since at least the time of receiving a notice

letter from Fleet Connect in April of 2023.

112.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus has been willfully blind of Fleet Connect's patent rights.

113.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

114.     Defendant's direct infringement of the '153 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

115.     Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Fleet Connect in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

116.     Fleet Connect has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Fleet Connect has and will continue to suffer this harm by virtue of Defendant's infringement of the '153 patent.  Defendant's actions have interfered with and will interfere with Fleet Connect's ability to license technology.  The balance of hardships favors Fleet Connect's ability to commercialize its own ideas and technology. The public interest in allowing Fleet Connect to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT VIII:          INFRINGEMENT OF UNITED STATES PATENT NO. 7,656,845

117.     Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

118.     The USPTO duly issued the '845 patent on February 2, 2010 after full and fair

examination of Application No. 11/402,172 which was filed on April 11, 2006. A true and correct copy of the '845 patent is attached as **Ex. H**. A Certificate of Correction was issued on November 30, 2010. *See id.*

119.    The claims of the '845 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods of wireless communication with a mobile unit.

120.    The written description of the '845 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

121.    Fleet Connect owns all substantial rights, interest, and title in and to the '845 patent, including the sole and exclusive right to prosecute this action and enforce the '845 patent against infringers and to collect damages for all relevant times.

122.    Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '845 patent.

123.    Defendant has directly infringed the '845 patent by importing, selling, manufacturing, offering to sell, using, providing, supplying, or distributing the Accused Products.

124.    Defendant has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, at least claim 12 of the '845 patent. For example, the Accused Products used by Defendant provide a system comprising a processor, a first transceiver

configured to communicate *via* a first medium, a second transceiver configured to communicate *via* a second medium, wherein at least one of the first transceiver and the second transceiver is configured to retry transmission of a packet at a lower rate if a prior transmission of the packet is not acknowledged, an allocation unit configured to dynamically allocate data channels to one of the first medium and the second medium based upon a desired level of service.



# What hardware is included in Riv Driver+?

Every Rivian vehicle includes our complete Driver+ hardware system and redundant onboard computers:

Source: https://rivian.com/support/article/what-hardware-is-included-in-rivian-driver



Source: **Ex. K**, at page K-5



# PHONE

## Bluetooth Pairing

Your vehicle uses *Bluetooth*® to connect to phones.

Source: **Exhibit L**, at page L-10.

125.     More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products allocates at least one of a plurality of data channels to a first medium for data transmission *via* a wireless device and allocates at least one remaining data channel of the plurality of data channels to a second medium for data transmission via the wireless device.  3GPP TS 36.211 sets forth a resource grid structure for a base station, *e.g.,* eNB, for allocating transmission resources to 4G LTE systems.  According to this two-dimensional time and frequency grid structure, frequency channels are shared between different transceivers in time domain, by using TDM slot channels.  A unit time slot spanning a group of subcarriers (*e.g.,* 12 adjacent subcarriers equivalent to 180KHz frequency) is referred to as an RB or PRB.  A resource block (a time and frequency unit) is the smallest bandwidth or unit of transmission resource that a base station can allocate to a transceiver.  Further, each radio time frame (10ms in case of LTE) is divided into multiple sub-frames (1ms each) and each such sub-frame includes two time slots. 3GPP LTE base stations follow OFDMA based multiplexing in resource allocation.  Each media or transceiver is allocated one or more (a group of) RBs/PRBs for data communication in uplink and/or downlink, *i.e.,* each transceiver is allocated a fixed set of subcarriers over a period of time. A first transceiver communicates using its allocated frequency subcarriers (first medium), while a second transceiver uses its allocated subcarriers to communicate (second medium).  A first and second media that are allocated RBs along the same time frame or sub-frame. overlap in frequency. More specifically, and as just one example of infringement, the base station dynamically adjusts, during data transmission, a number of the data channels assigned to one of the first and second media to remain within limits of a desired level of service.  3GPP TS 36.211, 36.212, 36.213, 36.300 specify that 3GPP LTE base stations (eNBs) implement resource scheduling and allocation of one or more time slots or PRBs or RBs, *i.e.*, a group of subcarriers for a predetermined time

period, to a first transceiver to use as a transmission medium (first medium), and the remaining time slots or PRBs or RBs to a second transceiver to use as a transmission medium (second medium).  Further, the time slot channels allocation is dynamic, and can be dynamically adjusted during the data transmission based on various criteria, such as data traffic volume, QoS requirements, *etc.* to remain within limits of a desired level of service.  802.15.2-2003 defines a Collaborative Coexistence Mechanism ("allocation unit") with an AWMA Medium Free Generation that is configured to dynamically allocate data channels to one of the 802.11 Device and the 802.15.1 Device based upon a desired level of service.  The Accused Products allocate a time-slot channel (WLAN interval) to the first medium (802.11b) for data transmission and a different time-slot channel (WPAN interval) to the second medium (802.15.1).  The 802.11b beacon frame includes a Medium Sharing Element (MSE) which defines the length of the time-slot channels (WLAN, WPAN, and Guard).  The Offset, Length and Guard intervals can be dynamically adjusted to modify the number of time-slot channels assigned to WLAN and WPAN data transmission to remain within limits of a desired level of service.

126.    Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed and continues to indirectly infringe the '845 patent by inducing others to directly infringe the '845 patent.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '845 patent by providing or requiring use of the Accused Products.  Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '845 patent, including, for example, claim 12 of the '845 patent.  Such steps by Defendant include, among other things, advising or

directing personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner. Defendant is performing these steps, which constitute induced infringement with the knowledge of the '845 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of the Accused Products by others would infringe the '845 patent. Defendant's inducement is ongoing.

127. Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of the '845 patent. Defendant has contributed to the direct infringement of the '845 patent by its personnel, contractors, distributors, and customers. The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '845 patent, including, for example, claim 12 of the '845 patent. The special features constitute a material part of the invention of one or more of the claims of the '845 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant's contributory infringement is ongoing.

128. Defendant had knowledge of the '845 patent since at least the time of receiving a notice letter from Fleet Connect in April of 2023.

129. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus has been willfully blind of Fleet Connect's patent rights.

130. Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

131.     Defendant's direct infringement of the '845 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

132.     Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Fleet Connect in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

133.     Fleet Connect has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Fleet Connect has and will continue to suffer this harm by virtue of Defendant's infringement of the '845 patent.  Defendant's actions have interfered with and will interfere with Fleet Connect's ability to license technology.  The balance of hardships favors Fleet Connect's ability to commercialize its own ideas and technology. The public interest in allowing Fleet Connect to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

### COUNT IX:   INFRINGEMENT OF UNITED STATES PATENT NO. 7,742,388

134.     Fleet Connect repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

135.     The USPTO duly issued the '388 patent on June 22, 2010, after full and fair examination of Application No. 11/185,665 which was filed July 20, 2005.  A true and correct copy of the '388 patent is attached as **Ex. I**.

136.     The claims of the '388 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods of generating packets in a digital communications system.

137.     The written description of the '388 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

138.     Fleet Connect owns all substantial rights, interest, and title in and to the '388 patent, including the sole and exclusive right to prosecute this action and enforce the '388 patent against infringers and to collect damages for all relevant times.

139.     Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '388 patent.

140.     Defendant has directly infringed and continue to directly infringe one or more claims of the '388 patent by manufacturing, providing, supplying, using, distributing, selling, or offering to sell the Accused Products.

141.     Defendant has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '388 patent.  For example, Defendant performs a method including generating a packet with a size corresponding to a protocol used for a network transmission, wherein the packet comprises a preamble having a first training symbol and a second training symbol.  The method further includes increasing the size of the packet by adding subcarriers to the second training symbol of the packet to produce an extended packet, wherein a quantity of subcarriers of the second training symbol is greater than a quantity of subcarriers of the first training symbol; and transmitting the extended packet from an antenna.

142.     More specifically, and as just one example of infringement, Defendant's conduct has

comprised using the Accused Products, which are adapted for wireless communications using 802.11n and/or the 3GPP Long Term Evolution cellular standard ("LTE").  The Accused Products receive the generated packet (or "frame") with a size ("Tf") corresponding to a protocol (LTE) used for network transmission.  Each packet (or "frame) comprises 10 subframes, each sub frame equals 1ms duration. Further each subframe includes two slots each 0.5 ms long. An LTE frame structure (for example frame structure Type 1) is defined using a resource grid that include multiple subcarriers and OFDM symbols. The resource grid represents various subframes/slots that can include multiple signals such as synchronization signals and reference signals. The synchronization signals PSS and SSS (first training symbols) are used for time and frequency synchronization steps to identify where the frame begins and ends. Also, the reference signals/symbols (second training symbols) are used for the channel estimation.  Similarly, the Accused Products generate a packet (or "frame") with a size ("LENGTH") corresponding to a protocol (*e.g.,* 802.11n) used for network transmission. The packet (or "frame") comprises a preamble ("PLCP Preamble") having a first training symbol ("Short Training Sequence" or "STS") in HT-STF field and a second training symbol ("Long Training Sequence" or "LTS") in HT-LTF fields.  The Accused Products increase the size of the packet by adding subcarriers to the second training symbol ("Reference Signal") to produce an extended packet.  The quantity of subcarriers of the second training symbol ("Reference Signal") is greater than a quantity of subcarriers of the first training symbol ("Synchronization Signals").  Likewise, when utilizing the 802.11 protocols, the Accused Products increase the size of the packet by adding subcarriers to the second training symbol ("LTS") to produce an extended packet. The quantity of subcarriers of the second training symbol ("LTS") is greater than a quantity of subcarriers of the first training symbol ("STS").  The Accused Products receive the extended packet transmitted via network and include antennas for

transmitting the extended packet.



Source*:* **Ex. K**, at page K-5

143.     Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has indirectly infringed and continues to indirectly infringe the '388 patent by inducing others to directly infringe the '388 patent.   Defendant has induced and continue to induce customers and end-users, including, but not limited to, Defendant's customers, employees, partners, or contractors, to directly infringe, either literally or under the doctrine of equivalents, the '388 patent by providing or requiring use of the Accused Products.   Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '388 patent, including, for example, claim 1.   Such steps by Defendant has included, among other things, advising or directing customers, personnel, contractors, or end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide users to use the Accused Products in an infringing manner.   Defendant has been performing these steps, which constitute induced infringement with the knowledge of the '388 patent and with the knowledge that the induced acts

constitute infringement.  Defendant has been aware that the normal and customary use of the Accused Products by others would infringe the '388 patent.  Defendant's inducement is ongoing.

144.    Since at least the time of receiving a notice letter from Fleet Connect in April of 2023, Defendant has indirectly infringed and continues to indirectly infringe by contributing to the infringement of the '388 patent.  Defendant has contributed and continue to contribute to the direct infringement of the '388 patent by its customers, personnel, and contractors.  The Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '388 patent, including, for example, claim 1.  The special features constitute a material part of the invention of one or more of the claims of the '388 patent and are not staple articles of commerce suitable for substantial non-infringing use.  Defendant's contributory infringement is ongoing.

145.    Defendant had knowledge of the '388 patent since at least the time of receiving a notice letter from Fleet Connect in April of 2023.

146.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Fleet Connect's patent rights.

147.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

148.    Defendant's infringement of the '388 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Fleet Connect's rights under the patent.

149.    Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Fleet Connect in an amount that compensates it for

such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

150.    Fleet Connect has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Fleet Connect has and will continue to suffer this harm by virtue of Defendant's infringement of the '388 patent.  Defendant's actions have interfered with and will interfere with Fleet Connect's ability to license technology.  The balance of hardships favors Fleet Connect's ability to commercialize its own ideas and technology. The public interest in allowing Fleet Connect to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

### COUNT X:   INFRINGEMENT OF UNITED STATES PATENT NO. 8,005,053

151.    Fleet Connect repeats and re-alleges the allegations in Paragraphs 1-46 as though fully set forth in their entirety.

152.    The United States Patent and Trademark Office ("USPTO") duly issued the '053 patent on August 23, 2011, after full and fair examination of Application No. 12/696,760, which was filed on January 29, 2010.  *See* **Ex. J**.

153.    The claims of the '053 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.   Rather, the claimed inventions include inventive components that improve upon the function and operation of voice and data communications systems.

154.    The written description of the '053 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of

the invention.

155.    Fleet Connect owns all substantial rights, interest, and title in and to the '053 patent, including the sole and exclusive right to prosecute this action and enforce the '053 patent against infringers and to collect damages for all relevant times.

156.    Fleet Connect or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '053 patent.

157.    Defendant has directly infringed the '053 patent by importing, selling, manufacturing, offering to sell, using, providing, supplying, or distributing the Accused Products.

158.    Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claim 10 of the '053 patent. For example, Defendant performs a method comprising a communication device storing data encoded for a plurality of different wireless protocols, the communication device including a plurality of wireless transceivers, each of which is configured to transmit data according to a corresponding one of the plurality of different wireless protocols where the communication device selects one of the plurality of different wireless protocols and encodes data of an unselected one of the plurality of different wireless protocols into the selected wireless protocol, and transmits the encoded data using the one of the plurality of wireless transceivers corresponding to the selected wireless protocol.

159.    More specifically, and as just one example of infringement, Defendant's conduct has comprised using the Accused Products, which are adapted for wireless communications using Wi-Fi and/or LTE and/or Bluetooth.  3GPP Technical Report (TR) 36.816 v1.0.0 (2010-11), Release 10 and 3GPP Technical Specification (TS) 36.300 V11.4.0 (2012-12) sets forth the mechanism of in-device coexistence within the same user equipment (UE). The Accused Products

("communication device") are equipped with multiple radio transceivers. The multiple radio transceivers include LTE, Wi-Fi/Bluetooth transceiver ("plurality of wireless transceivers"). The UE including the Wi-Fi/Bluetooth transceiver communicates data using the 802.11 protocol or 802.15.1 ("wireless protocols"). Further, 3GPP Technical Specification (TS) 36.300 V11.4.0 (2012-12), Release 11 shows that the UE including the LTE transceiver communicates data using the E-UTRAN protocol stack ("wireless protocols"). Also, the UE stores data encoded for a plurality of different wireless protocols.  Further, 3GPP Technical Specification (TS) 36.331 V11.2.0 (2012-12), Release 11 and 3GPP Technical Specification (TS) 23.402 V11.8.0 (2013-12), Release 11 shows that UE and E-UTRAN exchange assistance parameters *via* dedicated RRC signaling. The UE uses the RAN suggested assistance parameters/policies for data traffic steering decisions between E-UTRAN and WLAN. The access network selection and traffic steering between 3GPP access and non-3GPP access such as WLAN is provided using a network element such as 'Access Network Discovery and Selection Function (ANDSF)'. The ANDSF provides various types of information to the UE such as inter-system mobility policy, inter-system routing policy, network access discovery information, *etc.* For example, the ANDSF assist the UE to use operator defined inter-system routing policies or rules to discover and select the most preferable access technology such as cellular or WLAN ("selecting one of the plurality of different wireless protocols") for data communication.  When using Wi-Fi and Bluetooth, the Accused Products are configured to encode data for the unselected protocol (*e.g.,* Bluetooth) into data for the selected protocol (*e.g.,* the WLAN or the cellular). When using LTE cellular and another standard protocol such as Wi-Fi or non-LTE cellular, the Accused Products are configured to encode data for the unselected protocol (*e.g.,* cellular) into data for the selected protocol (*e.g.,* the WLAN).  Before data transmission, the UE would encode the data of the wireless protocol for the unselected

transceiver (i.e., Wi-Fi or LTE) into data of the wireless protocol for the selected transceiver (i.e., Wi-Fi or LTE).  3GPP Technical Report (TR) 36.816 v1.0.0 (2010-11), Release 10 shows that when UE ("communication device") transmits data using Wi-Fi protocol, UE would encode the data of the LTE or cellular protocol into data of the Wi-Fi protocol.

# What hardware is included in Riv Driver+?

Every Rivian vehicle includes our complete Driver+ hardware system and redundant onboard computers:

(Source: https://rivian.com/support/article/what-hardware-is-included-in-rivian-driver)

| Integrated Module Info: | ❖ WLAN (Wi-Fi 2.4, 5 GHz) , Bluetooth  BDR/EDR: |
|---|---|
| | • FCC ID                : XPYJODYW167 |
| | • Name / Number      : UBLOX / JODY-W1 |
| | ▪ Wi-Fi 2.4 and 5 GHz : 802.11 a/b/g/n/h/ac |
| | ▪ Bluetooth BDR/EDR : Disabled. See Note 1 |
| | ❖ Cellular Module: |
| | • Name / Number      : ALAS5-AM |
| | • FCC ID                : QIPALAS5-AM |
| | ❖ GPS/GNSS: |
| | • UBLOX NEO - M8L - 04A Standalone GNSS receiver |
| | • GEMALTO AIAS5 – GNSS receiver module integrated with the cellular modem. |

Source*: **Ex. K**, at page K-5

# PHONE

## Bluetooth Pairing

Your vehicle uses *Bluetooth*® to connect to phones.

Source: **Ex. L**, at page L-10.

160.    Fleet Connect has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Fleet Connect in an amount that compensates it for

such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## DEMAND FOR JURY TRIAL

161.    Fleet Connect hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

162.    WHEREFORE, Fleet Connect requests that the Court find in its favor and against Defendant, and that the Court grant Fleet Connect the following relief:

a.    Judgment that one or more claims of each of the Asserted Patents has been infringed, either literally or under the doctrine of equivalents, by Defendant or others acting in concert therewith;

b.    A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of the '040 patent, the '837, the '153 patent, the '845 patent, and the '388 patent; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of the Asserted Patents by such entities;

c.    Judgment that Defendant account for and pay to Fleet Connect all damages to and costs incurred by Fleet Connect because of Defendant's infringing activities and other conduct complained of herein;

d.    Judgment that Defendant's infringements of the '040 patent, the '837 patent, the '153 patent, the '845 patent, and the '388 patent be found willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

e.    Pre-judgment and post-judgment interest on the damages caused by Defendant's

infringing activities and other conduct complained of herein;

f.   That this Court declare this an exceptional case and award Fleet Connect its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

g.   All other and further relief as the Court may deem just and proper under the circumstances.

Dated: <u>August 23, 2023</u>    Respectfully submitted,

*By:/s/ James F. McDonough, III*

James F. McDonough, III*
Jonathan R. Miller*
Travis E. Lynch*
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue, Suite 254
Atlanta, Georgia 30312
Telephone: (470) 480-9505; -9517; -9514
Email: jim@rhmtrial.com
Email: miller@rhmtrial.com
Email: lynch@rhmtrial.com

Jonathan L. Hardt (TX 24039906)*
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite C
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

*Attorneys for FLEET CONNECT SOLUTIONS LLC*

*Admitted to the Western District of Texas

**List of Exhibits**
   A.  U.S. Patent No. 7,450,955
   B.  U.S. Patent No. 7,206,837
   C.  U.S. Patent No. 6,549,583
   D.  U.S. Patent No. 6,633,616
   E.  U.S. Patent No. 7,058,040
   F.  U.S. Patent No. 8,494,581
   G.  U.S. Patent No. 7,260,153
   H.  U.S. Patent No. 7,656,845
   I.  U.S. Patent No. 7,742,388
   J.  U.S. Patent No. 8,005,053
   K.  "Radio Frequency Exposure Evaluation Report" for Telematics Control Module
   L.  Excerpt from R1T Owner's Guide (United States - August 14, 2023)